**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Xiping Wang,<br>Petitioner,<br>v.<br>Luis Rosa, Jr., et al.,<br>Respondents. | No. CV-26-02909-PHX-DWL (JZB)<br>**REPORT AND RECOMMENDATION** |

**TO THE HONORABLE DOMINIC W. LANZA, UNITED STATES DISTRICT JUDGE**:

Pending before the Court is Petitioner Xiping Wang's "Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief."[1] (Doc. 1.)

## I. SUMMARY OF CONCLUSIONS.

Petitioner's Petition presents the narrow question of whether a noncitizen subject to mandatory detention pursuant to 8 U.S.C. § 1225(b)(2) is nonetheless entitled to a bond hearing under the Due Process Clause of the Fifth Amendment when their detention has become prolonged. Based upon over a century of Supreme Court precedent and the history and tradition of the Fifth Amendment, the Court finds that such a noncitizen is entitled to the most basic procedural protection—a bond hearing. This is because such noncitizens do, in fact, possess a cognizable liberty interest in freedom from prolonged civil detention, an interest that the entry fiction doctrine does not obstruct.

---

[1] This action was referred to this Court "for further proceedings and a report and recommendation." (Doc. 3 at 3.)

Specifically, the Court does not find that the entry fiction doctrine unequivocally holds that a "person"—which a noncitizen surely is "in any ordinary sense of that term," *Plyler v. Doe*, 457 U.S. 202, 210 (1982)—can be physically within the bounds of our nation but lack any of the protections afforded by the Fifth Amendment. Indeed, stretching the entry fiction doctrine to the extent that noncitizens are without Fifth Amendment protections "can withstand neither the weight of logic nor that of principle, and has never been incorporated into the fabric of our constitutional jurisprudence." *Jean v. Nelson*, 472 U.S. 846, 869 (1985) (Marshall, J., dissenting). For if so, why then could the government not punish such noncitizens without "a judicial trial to establish the guilt of the accused," *Wong Wing v. United States*, 163 U.S. 228, 237 (1896), confiscate noncitizens' property without considering the Fifth Amendment protections, *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491–92 (1931), or completely loosened the reigns to give the political branch judicially unchecked power over admissions and exclusions of noncitizens? *Fiallo v. Bell*, 430 U.S. 787, 793 n.5 (1977) ("Our cases reflect acceptance of a limited judicial responsibility under the Constitution even with respect to the power of Congress to regulate the admission and exclusion of aliens"). No, "[o]nly the most perverse reading of the Constitution would deny detained aliens the right to bring constitutional challenges to the most basic conditions of their confinement." *Jean*, 472 U.S. at 874 (Marshall, J., dissenting).

All told, such an overbroad interpretation of the entry fiction doctrine does not, and cannot, overturn a century of Supreme Court caselaw, nor the Fifth Amendment itself. As the Supreme Court noted 50 years ago:

> There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, ***liberty***, or property without due process of law. . . . Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.

*Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (emphasis added).

Because the entry fiction doctrine, for the reasons stated herein, does not foreclose

Petitioner's right to procedural and substantive due process, the Court recommends the Petition be granted in part and denied in part. Specifically, the Court recommends that Petitioner be granted an individualized bond hearing.

## II. BACKGROUND.

Petitioner is a native and citizen of the People's Republic of China. (*Id.* at 2.) On February 7, 2025, Petitioner entered the U.S. without being admitted or paroled by an Immigration officer. (*Id.*) On an "[u]nkown date, [U.S. Border Patrol ("USBP")] removed Petitioner to Mexico." (*Id.* at 3.) Thereafter, on April 11, 2025, USBP agents detained Petitioner in Arizona after he had re-entered the country. (*Id.*)

On October 7, 2025, an Immigration Judge ("IJ") ordered Petitioner to be removed to China. (*Id.*) On October 29, 2025, Petitioner appealed the decision to the Board of Immigration Appeals ("BIA"). (*Id.*) Petitioner's appeal remains pending. (*Id.*)

## III. 28 U.S.C. § 2241 WRIT OF HABEAS CORPUS.

The district court is empowered to issue a writ of habeas corpus where an individual is held "in custody in violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241(c)(3). The language of § 2241 and "the common-law history of the writ" makes clear "that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) (noting that the writ of habeas corpus "was early recognized by [the Supreme] Court as a 'great constitutional privilege'") (quoting *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95 (1807)); *cf. In re Kaine*, 55 U.S. (14 How.) 103 (1852) (applying the writ of habeas corpus in the immigration context). The Supreme Court has made clear that § 2241 applies to noncitizens[2] challenging

---

[2] Undersigned shall use the term 'noncitizen' unless a quoted statute or court decision uses the term 'alien.' This usage is congruent with the Ninth Circuit Court of Appeals' precedent, such as *Avilez v. Garland*, which specifically stated:

> This opinion uses the term noncitizen unless quoting language from the immigration statutes or past opinions containing the term alien. There are two reasons behind this choice. First, use of the term noncitizen has become a common practice of the Supreme Court[.] Second, even if that were not the case, careful writers avoid language that reasonable readers might find offensive or distracting—unless the biased language is central to the meaning of the writing. The word alien can suggest "strange," "different,"

their immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

Because Petitioner only challenges his prolonged civil detention, the Court has jurisdiction to address the instant Petition. *See Lopez-Marroquin v. Barr*, 955 F.3d 759, 759 (9th Cir. 2020) ("[D]istrict courts retain jurisdiction under 28 U.S.C. § 2241 to consider habeas challenges to immigration detention that are sufficiently independent of the merits of the removal order[.]").

## IV. DISCUSSION.

### A. Statutory Basis for Petitioner's Detention.

"A noncitizen's place within this statutory scheme can affect whether his detention is mandatory or discretionary, as well as the kind of review process available to him if he wishes to contest the necessity of his detention." *Avilez v. Garland*, 69 F.4th 525, 529 (9th Cir. 2023) (cleaned up). Petitioner does not allege what provision he is currently held under. *See generally* (doc. 1.) Respondents assert that "[s]ection 1225(b)(1)(B)(ii) governs Petitioner's detention[.]" (Doc. 9 at 2.) However, given that Petitioner was placed in 8 U.S.C. § 1229a traditional removal proceedings considering his hearing before an IJ on his application for protections under CAT, (doc. 1 at 6), Petitioner's detention falls under 8 U.S.C. § 1225(b)(2). Furthermore, considering that Petitioner appealed his order of removal to the BIA, Petitioner does not have an administratively final order of removal. Hence, § 1225(b)(2) continues to govern Petitioner's detention in this action.

### B. Due Process.

The Court turns to Petitioner's due process claim. The Court's due process analysis is separated into two steps: first, the Court must ask "whether there exists a liberty or property interest of which a person has been deprived, and if so," the Court must then ask "whether the procedures followed by the [government] were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

//

---

> "repugnant," "hostile," and "opposed," . . . while the word noncitizen, which is synonymous, . . . avoids such connotations. Thus, noncitizen seems the better choice.

*Avilez v. Garland*, 69 F.4th 525, 527 n.1 (9th Cir. 2023) (cleaned up).

***1. Liberty Interest.***

"A liberty interest may arise from the Constitution itself[3] . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted). If a liberty interest is found, the Court then determines whether the administrative procedures are sufficient considering the "particular situation."[4] *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

In the instant action, the parties disagree whether Petitioner possesses a cognizable liberty interest. Petitioner argues that he has a liberty interest in being free from prolonged immigration detention, an interest that requires "his immediate release or in the alternative a custody redetermination hearing[.]" (Doc. 1 at 7) (cleaned up). Respondents contend that the entry fiction doctrine limits Petitioner's due process liberty interests to those procedures created by statute, which does not include a bond hearing.[5] (Doc. 9 at 2–7.) The Court

---

[3] "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690.

[4] The Court notes that due process is a flexible concept. This, however, "does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey*, 408 U.S. at 481.

[5] Respondents additionally allege that Petitioner does not have a "substantive due process right to a bond hearing." (Doc. 9 at 5.) This argument is unavailing because Petitioner is invoking the right to be free from physical restraint by the government, which is at the heart of the Fifth Amendment. *See* U.S. CONST. amend. V ("No person shall . . . be deprived of life, ***liberty***, or property, without due process of law[.]") (emphasis added). In fact, Respondents' substantive due process argument was rejected by the fifth Circuit Court of Appeals:

> The Government contends that these claims should be governed by two Supreme Court cases: *Washington v. Glucksberg*, 521 U.S. 702 (1997) and *Demore v. Kim*, 538 U.S. 510 (2003). Their detention does not, according to the Government, implicate an already-recognized fundamental right, and thus, their claimed liberty interest must be tested under the substantive due process framework laid out in *Glucksberg*. In addition, the Government asserts that the Supreme Court's straightforward statement in a similar case, "[d]etention during removal proceedings is a constitutionally permissible part of that process," *Demore*, 538 U.S. at 531, supports that there is no liberty interest to be protected here.
>
> We start with a summary. *Glucksberg* is inapposite because the aliens claim here the long-recognized, fundamental right to be free from physical restraint by the Government. *Demore* applies, but the *Demore* Court concerned removable aliens who had been convicted of crimes; it did not approve of a *per se* detention of all aliens pending removal proceedings.

disagrees with Respondents' reliance upon the entry fiction doctrine in the instant action.

The entry fiction doctrine asserted by Respondents is based upon the "distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality." *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958). The Supreme Court has noted that the latter category of noncitizens have "additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'" *Id.* (quoting *Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206, 212 (1953)); *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned") (quoting *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)). Those noncitizens who are on the "threshold of initial entry" are not considered "to have 'effected an entry[.]'" *Thuraissigiam*, 591 U.S. at 140 (quoting *Zadvydas*, 533 U.S. at 693). Put differently, "[w]hen an alien arrives at a port of entry—for example, an international airport—the alien is on U.S. soil, but the alien is not considered to have entered the country[.]" *Thuraissigiam*, 591 U.S. at 139. Therefore, while a noncitizen may be physically present within the country, they were "still in theory of law at the boundary line and had gained no foothold in the United States[.]" *Zadvydas*, 533 U.S. at 693 (quoting *Kaplan v. Tod*, 267 U.S. 228, 230 (1925)).

This distinction is predicated upon the following "fundamental proposition: '[t]he power to admit or exclude aliens is a sovereign prerogative.'" *Thuraissigiam*, 591 U.S. at 139 (cleaned up) (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)). "The Constitution gives 'the political department of the government' plenary authority to decide which aliens to admit, . . . and a concomitant of that power is the power to set the procedures to be followed in determining whether an alien should be admitted." *Thuraissigiam*, 591 U.S. at 139 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892)).[6]

---

*Rodriguez v. Ortega*, Nos. 26-50183, 26-50219, 26-50221, __F.4th__, 2026 U.S. App. LEXIS 19508, at *28–29 (5th Cir. July 2, 2026).

[6] Although the entry fiction doctrine is of judicial construction, its current application rests upon the text of the Immigration and Nationality Act ("INA") as modified by the 1996

Respondents rely on the Supreme Court's *Mezei* and *Thuraissigiam* decisions to support their contention that noncitizens—like Petitioner—"who are detained shortly after unlawful entry are treated as though they have not entered the United States" are precluded from invoking any Due Process claim not expressly provided for in the INA. (Doc. 9 at 3–4) (citation omitted). Consequently, in Respondents' perspective, Petitioner and these noncitizens are, at a minimum, without the plenary Due Process protections. The Court finds that neither *Mezei* nor *Thuraissigiam* support Respondents' broad entry fiction claim that Petitioner "does not have" a cognizable "protected liberty interest[.]" *See* (*id.* at 7.)

Turning first to *Mezei*, the Court finds this decision factually and legally distinguishable from the instant action because *Mezei* narrowly "concern[ed] an alien immigrant permanently excluded from the United States on ***security grounds***." *Mezei*, 345 U.S. at 207 (emphasis added). *Mezei* dealt with a noncitizen who, based "on a finding that [his] entry would be ***prejudicial to the public interest for security reasons***," was detained "without a hearing before a board of special inquiry" on Ellis Island. *Id.* at 208 (emphasis

---

Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). The INA, as it stands today, defines admission of a noncitizen as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Directly following the aforementioned provision is the following caveat: "An alien who is paroled under section 212(d)(5)"—codified at 8 U.S.C. § 1182(d)(5)—"shall not be considered to have been admitted." *Id.* § 1101(a)(13)(B). In analyzing this provision, the Court first employs the interpretive principle of "*verba cum effectu sunt accipienda*—that if possible, every word and every provision is to be given effect[.]" *United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*, 871 F.3d 791, 797 (9th Cir. 2017). Specifically, the Court applies this interpretive principle to the term "parole" because Congress's choice of this term "cannot be meaningless, else [it] would not have been used." *United States v. Butler*, 297 U.S. 1, 65 (1936).

The term parole, as it is used in the common vernacular, means "a conditional release of a prisoner serving an indeterminate or unexpired sentence." *Parole*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). In its technical form, parole means "[t]he temporary release of an inadmissible alien into the United States for urgent humanitarian reasons or for significant public benefit." *Parole*, Black's Law Dictionary (12th ed. 2024). The common undercurrent between the common and technical understanding of the term parole is that the individual's release is ***conditional***.

Turning next to the issue at hand, bond hearings, the word bond, in its common meaning, is "an obligation made binding by a money forfeit." *Bond*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Such definition is in conformity with the legal definition of bond. *See Bond*, Garner's Dictionary of Legal Usage (3d ed. 2011) ("[S]ecurity for a released prisoner's return for trial[.]"). As both the common and legal usage of bond establish, a release on bond is ***conditional***. Given that release on bond, based on common and technical understanding of the word, is akin to release on parole in that it is conditional, it is apparent that release on bond does not equate admissions.

added). Specifically, the government, pursuant to the Passport Act of 1918, decided to bar Mezei based on national security grounds, due, in part or whole in the majority's view, because he "simply left the United States and remained behind the Iron Curtain for 19 months."[7] *Id.* at 210–11, 214. Consequently, when his case reached the Supreme Court, Mezei "was for two years held a prisoner[8] on Ellis Island by order of the Attorney General." *Id.* at 217 (Black, J., dissenting).

It is with this backdrop that the Supreme Court held that Mezei's detention without the possibility of release on bond did not "deprive[] him of any statutory or constitutional right." *Id.* at 215. Situated within *Mezei*'s dicta, the Court noted that "an alien on the threshold of initial entry stands on a different footing: '[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" *Id.* at 212 (quoting *Knauff*, 338 U.S. at 544). While this announcement in *Mezei*'s dicta appears, on first glance, dispositive, it is, upon further inspection, narrowly limited to those situations where a noncitizen poses a national security risk. The first reason why this statement does not implicate all arriving noncitizens is because of the context of the case in which it was announced. As noted by Chief Justice Marshall, it is a:

> maxim[,] not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821).

In both *Mezei* and *Knauff*—which *Mezei* relied upon in large part—the cases

---

[7] In fact, the Court did not know the reasons why Mezei was excluded, as under the Passport Act of 1918, the Attorney General was not required to "disclose the evidence upon which that determination rests." *Id.* at 215. While the majority's reliance, in hindsight, is questionable considering that "[s]ecurity is like liberty in that many are the crimes committed in its name," *Knauff*, 338 U.S. at 551 (Jackson, J., dissenting), it nonetheless formed the basis upon which *Mezei* was decided.

[8] Mezei was 'free' to depart for other nations, but none would have him. *See id.* at 208–09. In effect, absent Mezei being "an amphibian," he was "incarcerated by a combination of forces which keep him as effectually as a prison, the dominant and proximate of these forces being the United States immigration authority." *Id.* at 220 (Jackson, J., dissenting).

expressly addressed Due Process challenges asserted by noncitizens who posed a national security risk. *Mezei*, 345 U.S. at 207; *see also Knauff*, 338 U.S. at 539 ("May the United States exclude without hearing, solely upon a finding by the Attorney General that her admission would be prejudicial to the interests of the United States, the alien wife of a citizen who had served honorably in the armed forces of the United States during World War II?"). Hence, *Mezei*'s dicta, specifically dealing with a noncitizen posing a national security risk, does not control the exact issue before the Court today.

Second, other precedent establishes that noncitizens encompassed by the entry fiction do, in fact, possess due process protections outside of the black-letter wording of the INA. As early as 1896 in *Wong Wing*, the Supreme Court has noted that noncitizens could not be subject to "infamous punishment at hard labor, or by confiscating their property" without "a judicial trial to establish the guilt of the accused." *Wong Wing*, 163 U.S. at 237. In the 1960s and 70s, our own Circuit established that noncitizens are entitled to *Miranda* warnings. *See Chavez-Martinez v. United States*, 407 F.2d 535, 539 (9th Cir. 1969); *United States v. Casimiro-Benitez*, 533 F.2d 1121, 1124 (9th Cir. 1976). In 2008, the Supreme Court substantiated "that the privilege of habeas corpus entitles" noncitizens—albeit in the context of noncitizen detainees designated as enemy combatants—"to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (quoting *Immigr. and Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 302 (2001)). And, as of 2021, the Ninth Circuit, although overturning the district court's preliminary injunction, did not contend that noncitizen detainees could not assert Fifth Amendment deliberate indifference or conditions of confinement claims. *Cf. Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 647–50 (9th Cir. 2021).

As these decisions make clear, a noncitizen's Fifth Amendment rights are not expressly limited to the text of the INA under the entry fiction doctrine. Rather, it is only those rights regarding ***admissions*** that are. Consequently, *Mezei* is inapplicable to the instant action.

This finding is in harmony with, not contrary to, the Supreme Court's *Thuraissigiam* decision. In *Thuraissigiam*, the Court did not address a habeas petition challenging an "unlawful executive detention" and seeking "simple release[.]" *Thuraissigiam*, 591 U.S. at 119 (quoting *Munaf v. Geren*, 553 U.S. 674, 693, 697 (2008)). Instead, the Court addressed a matter "far outside the core of habeas": a request to be provided with "a new opportunity to apply for asylum and other applicable forms of relief." *Id.* at 115, 119. In fact, the noncitizen's "petition made no mention of release from custody." *Id.* at 115. Because of this, the Court noted that the Thuraissigiam "d[id] not want simple release but, ultimately, the opportunity to remain lawfully in the United States." *Id.* at 119 (citation omitted). Hence, Thuraissigiam's petition sought more than just release—which, in fact, he did not seek. Rather, Thuraissigiam sought admission to the country.[9]

It is through this context that the Court addressed Thuraissigiam's due process challenge. The Supreme Court, in applying the entry fiction doctrine and its prior decisions, including *Mezei* and *Knauff*, found that a noncitizen on the threshold "has only those rights regarding ***admission*** that Congress has provided by statute." *Id.* at 140 (emphasis added). With this in mind, the Court held that, as to Thuraissigiam's request for admission into the U.S., "Congress [had] provided the right to a determination whether he had a significant possibility of establishing eligibility for asylum, and he was given that right. . . . Because the Due Process Clause provides nothing more, it does not require review of that determination or how it was made." *Id.* (cleaned up). Thus, Thuraissigiam was provided with his rights as to ***admissions*** under the Due Process Clause, and was not constitutionally entitled to any more process in seeking ***admissions*** into the U.S.

This Court's interpretation of *Mezei*, *Thuraissigiam*, and the entry fiction doctrine are supported by numerous courts, both in this District and its sister districts. *See D.V.D. v. U.S. Dep't of Homeland Sec.*, 821 F. Supp. 3d 102 (D. Mass. 2026)[10]; *see also Padilla*

[9] *See supra* note 6.

[10] While the Court acknowledges that *D.V.D.* is an out-of-circuit decision that is currently stayed by the First Circuit, undersigned is nonetheless persuaded by the analysis contained within *D.V.D.* Furthermore, the Court does not stand alone within this District in relying upon *D.V.D. See Khasanova v. Rokosky*, No. CV-26-00763-PHX-JCH (JFM), 2026 U.S. Dist. LEXIS 139896, at *8 (D. Ariz. June 24, 2026); *see also Zinaida v. Lyons*,

*v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163 (W.D. Wash. 2023).

For example, the district court in *D.V.D. v. U.S. Dep't of Homeland Sec.* recently illustrated why the entry fiction doctrine does not foreclose Petitioner's as-applied challenge to the length of their detention. In *D.V.D.*, the court noted that, although the entry fiction doctrine "provide[d] an exception to the otherwise geographic scope of the Due Process Clause," the doctrine only impacted those due process rights "regarding admission." *D.V.D.*, 821 F. Supp. 3d at 150 (cleaned up) (quoting *Thuraissigiam*, 591 U.S. at 140). The court proceeded to "distinguish rights regarding admission," which relates to the government's "sovereign authority to admit noncitizens only in cases as it may see fit," with other interests that might be implicated by the Due Process Clause. *Id.* at 151 (cleaned up). Because the *D.V.D.* petitioners neither challenged their orders of removal nor the process resulting in those orders, the government's sovereign prerogative was not implicated. *Id.* at 151 (citing *Johnson v. Guzman Chavez*, 594 U.S. 523, 536 (2021)). Hence, the entry fiction doctrine did not bar the petitioners' non-admissions due process challenges. *Id.* at 151–53.

In a truncated fashion, the district court in *Padilla* refuted the government's entry fiction argument. There, the court rejected the government's claim that the entry fiction doctrine broadly applied to any due process challenge, noting that such an assertion "is untethered to the claim in *Thuraissigiam* and the [Supreme] Court's reasoning." *Padilla*, 704 F. Supp. 3d at 1171. Rather, the entry fiction doctrine is constrained "only [to] those rights regarding admission that Congress has provided by statute." *Id.* at 1172 (emphasis omitted) (quoting *Thuraissigiam*, 591 U.S. at 140). Hence, where a petitioner "do[es] not challenge the admission process in any way or assert a right to remain in the United States," the entry fiction doctrine does not apply. *Padilla*, 704 F. Supp. 3d at 1172.

To state the matter bluntly, a bond hearing—as discussed above—does not equate admissions. *See Rincon v. Hyde*, 810 F. Supp. 3d 101, 107 (D. Mass. 2025) (noting that, if

No. CV-26-02866-PHX-RM (MTM), 2026 U.S. Dist. LEXIS 122386, at *4 (D. Ariz. June 3, 2026); *Salamakhin v. Noem*, No. CV-26-00330-PHX-AMM (MTM), 2026 U.S. Dist. LEXIS 103033, at *9 (D. Ariz. May 6, 2026); *Mozhubaev v. Rosa*, No. CV-26-00505-PHX-DJH, 2026 U.S. Dist. LEXIS 113646, at *4 (D. Ariz. May 22, 2026).

a petitioner were released following a bond hearing, they "will be subject to the same removal proceedings as before, with no new right to remain"). "Thus, Petitioner does not purport to invoke any 'rights regarding admission.'" *Id.* at 110 (quoting *Thuraissigiam*, 591 U.S. at 140).

Finally, and most importantly, finding that a noncitizen possesses a cognizable liberty interest is consistent with the history and tradition[11] of the Fifth Amendment and the Supreme Court's extensive catalog of decisions applying the Due Process Clause.

The Supreme Court has noted that in American society, "liberty is the norm," which

---

[11] Now, it is true that the entry fiction and release on bond—as it relates to immigration—were late nineteenth century constructs designed to ensure arriving noncitizens would not be forced to remain in the "disgusting and demoralizing conditions of traditional, non-steamer immigrant ships[.]" Eunice Lee, *The End of Entry Fiction*, 99 N.C. L. REV. 565, 584–88 (2021); *cf. Harisiades v. Shaughnessy*, 342 U.S. 580, 588 n.15 (1952) (noting that, prior to the 1880s, "[a]n open door to the immigrant was the early federal policy"). Hence, a perfect parallel cannot be drawn between a noncitizen's release on bond and practices at the time of the Fifth Amendment's ratification. However, a parallel may be drawn nonetheless to the colonial system of bail and release on bond prior to trial.

Bail as a legal construct arose "out of the pre-Norman system of amercements," slowly morphing through centuries of post-Magna Carta British common law to being "[a] right[] of Englishmen." Kellen R. Funk & Sandra G. Mayson, *Bail at the Founding*, 137 HARV. L. REV. 1816, 1827–28 (2024). At the time of this nation's founding, bail took two forms: (1) the Common Law Model which made bail discretionary in most cases; and (2) the Dissenter Model where prisoners enjoyed a right to bail by default in most every non-capital case. *Id.* at 1832–37. At the time of Articles of Confederation and at the naissance of our Constitutional democracy, the federal government and half of the states recognized the Dissenter Model. *Id.* at 1842–43. However, the Dissenter view soon became the majority after the admission of Connecticut, Delaware, and "all the states admitted from Vermont onwards[.]" *Id.* at 1843. Hence, at the ratification of the Fifth Amendment and soon thereafter, the founders recognized that, absent a criminal conviction, detention was to be the exception, with release on bond or similar suretyships as the norm.

This adoption of the Dissenter's view on bond rationally—if not directly—coincides with the founders' emphasis on the importance of the writ of habeas corpus at the nation's founding. For, in the words of Alexander Hamilton:

> the practice of arbitrary imprisonments have been in all ages the favourite and most formidable instruments of tyranny. The observations of the judicious . . . are well worthy of recital. To bereave a man of life (says he) or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism, as must at once convey the alarm of tyranny throughout the whole nation; but confinement of the person by secretly hurrying him to [jail], where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore *a more dangerous engine* of arbitrary government.

THE FEDERALIST No. 84 (Alexander Hamilton) (emphasis in original).

Hence, it is clear that the nation's founders considered prolonged and unjustified pre-trial detention as the antithesis of a just and free democracy, a scourge to be eradicated by the Fifth Amendment.

necessitates that civil detention "is the carefully limited exception." *Foucha v. Louisiana*, 504 U.S. 71, 83 (1992) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)); *Addington v. Texas*, 441 U.S. 418, 425 (1979) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."); *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (noting that the petitioner's interest from confinement was "the most elemental of liberty interests—the interest in being free from physical detention by one's own government"); *Hagar v. Reclamation Dist. No. 108*, 111 U.S. 701, 708 (1884) ("Undoubtedly where life and liberty are involved, due process requires that there be a regular course of judicial proceedings, which imply that the party to be affected shall have notice and an opportunity to be heard[.]"), *superseded by statute*, 31 U.S.C. § 5103; *cf. Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) ("The Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review") (citing *Boumediene v. Bush*, 553 U.S. at 781–83, 786). This contention is no less valid when considering that Petitioner is not a citizen, *see Yick Wo v. Hopkins*, 118 U.S. 356, 368–69 (1886), because "[t]he Fifth Amendment, as well as the Fourteenth Amendment, protects every one of" the "millions of aliens within the jurisdiction of the United States."[12] *Diaz*, 426 U.S. at 77; *Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.") (citing *The Japanese Immigration Case*, 189 U.S. at 100–01); *Wong Wing*, 163 U.S. at 238 ("[I]t must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by th[e Fifth and Sixth Amendments], and that even aliens shall not be . . . deprived of life, liberty, or property without due process of law.").

All told, Respondents' interpretation of the entry fiction doctrine would contravene

[12] Of course, this finding "does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship." *Id.* at 78. The Constitution clearly provides Congress a "broad power over naturalization and immigration," including the power to "make[] rules that would be unacceptable if applied to citizens." *Id.* at 80–81. The instant findings do not subvert these notions.

the Supreme Court's precedent on the Due Process Clause of the Fifth Amendment. It would subordinate "the most elemental of liberty interests—the interest in being free from physical detention by one's own government," *Hamdi*, 542 U.S. at 529—to that of a government official's discretion. It would, at its best, cast doubt over the Supreme Court's precedent applying the Due Process Clause to cases involving noncitizens. And, at its most invidious, it casts a doubt on a noncitizen's entitlement to any constitutional protection. *See Russian Volunteer Fleet*, 282 U.S. at 491–92 (applying Fifth Amendment Takings Clause protections to "alien friends"); *see also Wong Wing*, 163 U.S. at 238 (noting that the Fifth and Sixth Amendments apply to noncitizens); *Padilla v. Kentucky*, 559 U.S. 356, 373–74 (2010) (Sixth Amendment right to effective assistance of counsel in a criminal proceeding); *Truax v. Raich*, 239 U.S. 33, 41 (1915) (Fourteenth Amendment Equal Protection Clause); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419–22 (1948) (noting that the refusal to provide a noncitizen a commercial fishing license violated the Fourteenth Amendment); *Plyler*, 457 U.S. at 230 (striking down, pursuant to the Fourteenth Amendment Equal Protection Clause, a state law withholding funds for educating undocumented noncitizen children); *Yick Wo*, 118 U.S. at 374 (noting that an arbitrary ordinance regarding public laundries that, as applied, invidiously discriminated against noncitizen Chinese nationals, violated the Fourteenth Amendment); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."); *Casimiro-Benitez*, 533 F.2d at 1124 (Fifth Amendment *Miranda* rights apply to noncitizens).

For the foregoing reasons, the Court finds that a noncitizen does in fact possess a cognizable liberty interest from prolonged civil detention that is not precluded by the entry fiction doctrine.[13, 14]

[13] "[T]his maxim is ever invariably observed, that no fiction shall extend to work an injury[.]" 3 WILLIAM BLACKSTONE, COMMENTARIES *43.

[14] "No one can claim, nor since the time of slavery has anyone to my knowledge successfully claimed, that persons held within the United States are totally without constitutional protection. Whatever the fiction, would the Constitution leave the Government free to starve, beat, or lash those held within our boundaries? If not, then, whatever the fiction, how can the Constitution authorize the Government to imprison arbitrarily those who, whatever we might pretend, are in reality right here in the United

***2. Due Process Rights Regarding Petitioner's Prolonged Detention***.

Courts in this circuit and beyond have grappled over what test should be used to determine whether procedural due process requires relief for a noncitizen held pursuant to § 1225(b). *See Doe v. Andrews*, 1:25-cv-00333-JLT-HBK, at *15–17 (E.D. Cal. Mar. 23, 2026) (applying the 3-factor *Lopez* test); *see also Galkin v. Scott*, No. 2:26-cv-00530-TLF, 2026 U.S. Dist. LEXIS 46838, at *7 (W.D. Wash. Mar. 6, 2026) (applying the 6-part *Banda* test) (citing *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1118 (W.D. Wash. 2019)); *Leonteva v. Noem*, No. 4:26-cv-00043-SEB-KMB, 2026 U.S. Dist. LEXIS 52217, at *22 (S.D. Ind. Mar. 13, 2026) (applying the same 6-factor test, but calling it the *Jamal A* test) (*citing Jamal A. v. Whitaker*, 358 F. Supp. 3d 853, 858–59 (D. Minn. 2019)); *L.S. v. Warden, Otay Mesa Det. Ctr.*, No. 25-cv-3598-LL-BJW, 2026 U.S. Dist. LEXIS 10299, at *11–15 (S.D. Cal. Jan. 20, 2026) (applying the 3-part *Mathews v. Eldridge* test) (citing *Mathews*, 424 U.S. at 335).

Out of the abovementioned tests, the Court finds the *Banda* test the most applicable to the situation at hand. Undersigned recognizes the Presiding Judge's disapproval of *Banda* due to its failure to "cite or discuss *Barrera-Echavarria*, the 'entry fiction,' or the portions of *Rodriguez II* and *Rodriguez III* that seem to adopt *Barrera-Echavarria*'s logic as it pertains to arriving aliens who are detained under § 1225(b) and are subject to the entry fiction," *Ibarra-Perez v. Howard*, 468 F. Supp. 3d 1156, 1177 n.25 (D. Ariz. 2020), and because of the lack of unanimity throughout the districts on whether petitioners held under 1225(b) are—as the Court in *Banda* found—or are not entitled to a bond hearing once their detention has become prolonged. *Mamedova v. Noem*, No. CV-25-04619-PHX-DWL, 2026 U.S. Dist. LEXIS 94035, at *5–7 (D. Ariz. Apr. 28, 2026). However, beginning with the latter, the Court notes that the absence of statutory right cannot override what the Constitution dictates. As the Fifth Circuit Court of Appeals[15] recently noted:

---

States? The answer is that the Constitution does not authorize arbitrary detention." *Jennings v. Rodriguez*, 583 U.S. 281, 332 (2018) (Breyer, J., dissenting).

[15] "If neither [the Supreme Court] nor the relevant court of appeals has weighed in, a court may be able to look to other circuits for persuasive authority." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 824 (2024).

> The Government argues that regardless of the caselaw we have just discussed, what controls here is the lack of any statutory procedural rights for release from detention for aliens subject to Section 1225(b)(2)(A). The statute is clear that they 'shall be detained for a [removal] proceeding.' 8 U.S.C. § 1225(b)(2)(A). The statutory language 'unambiguously provides for mandatory detention.' *Buenrostro-Mendez*, 166 F.4th at 502. The Government insists that this absence of statutory rights means there are no constitutional ones. At best, that is true when there is no substantive right independent of the statute. ***Statutes do not override the Constitution, of course, so we must continue to enforce substantive constitutional rights regardless of statutory language***.

*Rodriguez v. Ortega*, Nos. 26-50183, 26-50219, 26-50221, __F.4th __, 2026 U.S. App. LEXIS 19508, at *23 (5th Cir. July 2, 2026) (emphasis added).[16]

The Court in *Rodriguez*, noting that "freedom from physical restraint, in whatever form, is at the 'core of the liberty protected by the Due Process Clause from arbitrary governmental action,'" found that this right "cannot be abridged by Congress or this court." *Id.* at *31 (quoting *Foucha*, 504 U.S. at 80). Rather, it could only be ***limited with justification***.[17] *Id.* (emphasis added). And, of course, the method of justification here would be a bond hearing.

Now, turning to the prior fault of *Banda*, though it does not "cite or discuss *Barrera-Echavarria*, the 'entry fiction,' or the portions of *Rodriguez II* and *Rodriguez III*," *Ibarra-Perez*, 468 F. Supp. 3d at 1177 n.25, this fault has been mitigated by the fact that *Banda* has been recently used numerous times by courts throughout this Circuit,[18] which amounts

---

[16] The Court notes that the 5th Circuit's panel opinion in *Rodriguez v. Ortega* was vacated pending rehearing *en banc*. *See Rodriguez v. Ortega*, Nos. 26-50183, 26-50219, 26-50221, __F.4th __, 2026 U.S. App. LEXIS 20321 (5th Cir. July 10, 2026). However, in both the Fifth Circuit and the Ninth Circuit, "[v]acated opinions remain persuasive, although not binding, authority." *See Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th Cir. 2002); *see also Munn v. City of Ocean Springs*, 763 F.3d 437, 441 (5th Cir. 2014) (noting that a decision vacated on rehearing *en banc* was "persuasive, albeit non-binding").

[17] Undersigned recognizes that the Fifth Circuit's decision interprets 1225(b) to include a wider array of noncitizens than courts within this Circuit have. But, the decision is nonetheless applicable to the case at hand, especially considering the Court—which recognized that the entry of a removal order was the theoretical endpoint of an arriving noncitizen's detention—"agree[d] with the Sixth Circuit insofar as it held that 'detention without an individualized bond hearing can become constitutionally impermissible, even if the detention has a theoretical end point.'" *Rodriguez*, 2026 U.S. App. LEXIS 19508, at *48 (quoting *Lopez-Campos v. Raycraft*, 175 F.4th 713, 734 (6th Cir. 2026)).

[18] *See Khasanova v. Rokosky*, No. CV-26-00763-PHX-JCH (JFM), 2026 U.S. Dist.

to a tacit finding that the entry fiction does not preclude a noncitizen's entitlement to a bond hearing when their detention has become prolonged. Hence, the concern that *Banda* failed to address the entry fiction has been remedied by its continued usage.

Under the *Banda* test, the Court considers the following factors:

> (1) the total length of detention to date; (2) the likely duration of future detention; (3) the conditions of detention; (4) delays in the removal proceedings caused by the detainee; (5) delays in the removal proceedings caused by the government; and (6) the likelihood that the removal proceedings will result in a final order of removal.

*Banda*, 385 F. Supp. 3d at 1118.

The Court finds the *Banda* test more suitable than the *Mathews*[19] and *Lopez*[20] tests. Regarding the *Mathews* test, the Court concurs with other district courts that have found that "while the *Mathews* factors may be well-suited to determining whether due process requires a second bond hearing, they are not particularly dispositive of whether prolonged

---

LEXIS 139896, at *13 (D. Ariz. June 24, 2026); *see also Rafiei v. Rivas*, No. CV-26-00498-PHX-RM, 2026 U.S. Dist. LEXIS 110458, at *6 (D. Ariz. May 19, 2026); *Weili Fu v. Borja*, No. 25-00048, 2026 U.S. Dist. LEXIS 94659, at *26 (D. Guam Apr. 27, 2026); *Ziyad v. Casey*, No. 3:26-cv-1782-CAB-DEB, 2026 U.S. Dist. LEXIS 100750, at *4–6 (S.D. Cal. May 6, 2026); *Fenhong Du v. Chestnut*, No. 1:26-cv-01435-DJC-CSK, 2026 U.S. Dist. LEXIS 60928, at *4–5 (E.D. Cal. Mar. 23, 2026); *Sandesh v. Larose*, No. 26-cv-0846-JES-DDL, 2026 U.S. Dist. LEXIS 45941, at *7 (S.D. Cal. Mar. 4, 2026) (collecting cases); *Salamakhin*, 2026 U.S. Dist. LEXIS 103033, at *13; *Puron v. Hernandez*, No. 2:26-cv-01428, 2026 U.S. Dist. LEXIS 127618, at *9–10 (W.D. Wash. June 9, 2026); *Soltanbakhsh v. Bondi*, No. CV-26-01572-PHX-SHR (JZB), 2026 U.S. Dist. LEXIS 118815, at *2 (D. Ariz. May 29, 2026) (adopting this Court's application of the *Banda* test in *Soltanbakhsh v. Bondi*, No. CV-26-01572-PHX-SHR (JZB), 2026 U.S. Dist. LEXIS 120439 (D. Ariz. May 6, 2026)).

[19] Under the *Mathews* test, the Court considers:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

[20] Under the *Lopez* test, "the Court will look to the total length of detention to date, the likely duration of future detention, and the delays in the removal proceedings caused by the petitioner and the government." *Lopez v. Garland*, 631 F. Supp. 3d 870, 879 (E.D. Cal. 2022). The Court notes that this test "concern[s] due process challenge[s] to mandatory detention under § 1226(c), [and] are, in essence, a truncated version of the factors enumerated in *Banda*[.]" *Andrews*, 1:25-cv-00333-JLT-HBK, at *14. Because the six-factor *Banda* test is more detailed than *Lopez* and is better suited for noncitizens held pursuant to § 1225(b), the Court accordingly elects to apply it.

mandatory detention has become unreasonable in a particular case." *Lopez v. Garland*, 631 F. Supp. 3d 870, 879 (E.D. Cal. 2022). Put differently, the *Mathews* test is apt where the question is whether an administrative procedure provided is "constitutionally sufficient," but "[i]t does not resolve the more fundamental issue of whether any procedure—such as a bond hearing—must be provided."[21] *Banda*, 385 F. Supp. 3d at 1106–07.

i. *Length of Detention*.

The first *Banda* factor is the length of detention, "which is the most important factor." *Banda*, 385 F. Supp. 3d at 1118. "It is important to bear in mind the context: [t]he detention that is being examined here is the detention of a human being who has never been found to pose a danger to the community or to be likely to flee if released." *Id.* (quoting *Jamal A.*, 358 F. Supp. 3d at 859).

Petitioner has been held in DHS custody for sixteen months. Under the first *Banda*

---

[21] In any event, the outcome applying *Mathews* and *Banda* would be the same—*i.e.*, Petitioner would be entitled to an individualized bond hearing. Applying the first *Mathews* element, undersigned finds that Petitioner has a strong private interest in his liberty from prolonged civil detention. *See Hernandez v. Sessions*, 872 F.3d 976, 993 (9th Cir. 2017) ("As to the first factor, the private interest at issue here is 'fundamental': freedom from imprisonment is at the 'core of the liberty protected by the Due Process Clause.'") (quoting *Foucha*, 504 U.S. at 80).

Turning to the second element, considering the prolonged nature of Petitioner's detention, the Court finds a large risk of erroneous deprivation in the absence of an individualized bond hearing. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1144 (9th Cir. 2013) (noting that the discretionary parole system envisioned under the Immigration and Naturalization Act is insufficient "to overcome the constitutional concerns raised by prolonged mandatory detention"). Hence, an individualized bond hearing would greatly mitigate the risk of a continued constitutional violation.

Finally, regarding the third *Mathews* factor, the government interest in detaining Petitioner without an individualized bond hearing is low. First, "[p]roviding petitioner with a bond hearing would not impede respondents' interest in effecting removal or protecting the public, as the purpose of the bond hearing is to determine whether petitioner is a danger or flight risk." *Jensen v. Garland*, No. 5:21-CV-01195-CAS (AFM), 2023 U.S. Dist. LEXIS 78505, at *17 (C.D. Cal. May 3, 2023). Second, the fiscal burden of providing an individualized bond hearing is low. *See Abduraimov v. Andrews*, No. 1:25-CV-00843-EPG-HC, 2025 U.S. Dist. LEXIS 202711, at *21 (E.D. Cal. Oct. 14, 2025) ("Courts generally have found that the cost of providing a bond hearing is relatively minimal, and there is nothing in the record before this Court demonstrating that providing Petitioner with a bond hearing would be fiscally or administratively burdensome."); *cf. Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (noting that "[t]he costs to the public of immigration detention are 'staggering': $158 each day per detainee, amounting to a total daily cost of $6.5 million. Supervised release programs cost much less by comparison: between 17 cents and 17 dollars each day per person"). Therefore, the third factor minimally favors the government. Accordingly, applying the *Mathews* test to Petitioner's sixteen-month detention, undersigned concludes that due process requires he be provided with an individualized bond hearing.

factor, where a petitioner's current detention exceeds a six-month threshold, their "detention becomes less and less reasonable." *Haidari v. Immigr. & Customs Enf't Field Off. Dir.*, No. 2:26-cv-00039-TL, 2026 U.S. Dist. LEXIS 56882, at *8 (W.D. Wash. Mar. 18, 2026) (quoting *L.B.O.M. v. Hermosillo*, No. 2:25-cv-02695-GJL, 2026 U.S. Dist. LEXIS 21291, at *8 (W.D. Wash. Feb. 2, 2026).

Petitioner's detention is well beyond the six-month threshold, and well beyond the length of confinement other courts have found to be prolonged. *See, e.g.*, *Liang Ding v. Noem*, No. 1:26-cv-01217-DJC-SCR, 2026 U.S. Dist. LEXIS 58212, at *3–4 (E.D. Cal. Mar. 19, 2026) (noting that an eight-month detention is sufficiently prolonged to warrant granting relief); *Amado v. U.S. Dep't of Just.*, No. 25-cv-2687-LL (DDL), 2025 U.S. Dist. LEXIS 217453, at *14 (S.D. Cal. Nov. 4, 2025) ("To date, [p]etitioner has been in detention for approximately thirteen months. Courts have found detention over seven months without a bond hearing weighs toward a finding that it is unreasonable."); *Kadir v. Larose*, No. 25cv1045-LL-MMP, 2025 U.S. Dist. LEXIS 203614, at *13 (S.D. Cal. Oct. 15, 2025) (noting that 13 months without a bond hearing is prolonged); *cf. Banda*, 385 F. Supp. 3d at 1118 ("Petitioner has been in detention for approximately 17 months, which is a very long time."). In light of these decisions, and based upon the facts of the instant action, the Court finds the length of Petitioner's detention strongly favors granting relief.

*ii. Likely Duration of Future Detention.*

The second factor requires the Court to "consider[] how long the detention is likely to continue absent judicial intervention; in other words, the anticipated duration of all removal proceedings—including administrative and judicial appeals." *Banda*, 385 F. Supp. 3d at 1119 (citation omitted). "When the alien's removal proceedings are unlikely to end soon, this suggests that continued detention without a bond hearing is unreasonable." *Akmal v. Warden of Cal. City Det.*, No. 1:25-CV-01921-DC-DMC-HC, 2026 U.S. Dist. LEXIS 48058, at *17 (E.D. Cal. Mar. 9, 2026) (quoting *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 211 (3d Cir. 2020)).

While the length of future detention is uncertain considering Petitioner's appeal to

the BIA, the Court finds that the likely duration of future detention is sufficiently lengthy for this factor to favor Petitioner. *See Kadir*, 2025 U.S. Dist. LEXIS 203614, at *8 ("Petitioner's future detention can last several more months or even years during the adjudication of Respondents' appeal to the BIA."); *see also Liang Ding*, 2026 U.S. Dist. LEXIS 58212, at *4 ("[E]ither party may seek Ninth Circuit review of the [BIA's] decision. Therefore, [p]etitioner faces indefinitely prolonged detention while administrative and potentially judicial appeals of his removal order are decided. Thus, this factor weighs in [p]etitioner's favor.").

*iii. Conditions of Detention*.

The third factor requires the Court to consider the conditions of confinement. *Banda*, 385 F. Supp. 3d at 1119. "The more that the conditions under which the [noncitizen] is being held resemble penal confinement, the stronger his argument that he is entitled to a bond hearing." *Id.* (citation omitted). Neither party has addressed Petitioner's conditions of detention. Hence, the Court finds this factor neutral.

*iv. Delays in Removal Proceedings*.

Next, the Court shall analyze the "fourth and fifth [*Banda*] factors—both of which consider delays caused by the parties—together." *Maliwat v. Scott*, No. 2:25-CV-00788-TMC, 2025 U.S. Dist. LEXIS 152663, at *15 (W.D. Wash. Aug. 7, 2025).

The fourth factor requires the Court to consider the nature and extent of any delays caused by Petitioner. "Courts should be sensitive to the possibility that dilatory tactics by the removable noncitizen may serve not only to put off the final day of deportation, but also to compel a determination that the noncitizen must be released because of the length of his incarceration." *Banda*, 385 F. Supp. 3d at 1119 (cleaned up).

In the instant action, Petitioner has appealed the IJ's order of removal. While it is true that Petitioner has delayed his own removal, the Court does not find that this was a dilatory tactic aimed at extending his detention so he could then seek release. Regardless, based on a review of our sister districts' caselaw, the Court is persuaded that a petitioner "should not be effectively punished through indefinite detention for exercising her right to

appeal her removal order." *Yuehui Chen v. Noem*, No. 5:26-CV-00397-SSS-DTB, 2026 U.S. Dist. LEXIS 31999, at *15 (C.D. Cal. Feb. 13, 2026); *Marroquin Ambriz v. Barr*, 420 F. Supp. 3d 953, 964 (N.D. Cal. 2019) ("But the government's suggestion that Petitioner's choice to appeal adverse rulings weighs against any constitutional claim that he may make regarding his detention during the course of the appeal is untenable, and the Court will not require that a petitioner who pursues his available legal remedies must forego any challenge to the reasonableness of his detention in the interim.") (cleaned up); *Barraza v. ICE Field Off. Dir.*, No. C23-1271-BHS-MLP, 2023 U.S. Dist. LEXIS 235170, at *15 (W.D. Wash. Dec. 8, 2023), *report and recommendation adopted sub nom. Barraza v. U.S. Immigr. & Customs Enf't Field Off. Dir.*, No. C23-1271 BHS, 2024 U.S. Dist. LEXIS 23423 (W.D. Wash. Feb. 9, 2024) ("Petitioner is entitled to raise legitimate defenses to removal . . . and such challenges to his removal cannot undermine his claim that detention has become unreasonable.") (citing *Liban M.J. v. Sec. of Dep't of Homeland Sec'y.*, 367 F. Supp. 3d 959, 965 (D. Minn. 2019)); *Henriquez v. Garland*, No. 5:22-cv-00869-EJD, 2022 U.S. Dist. LEXIS 106045, at *12 (N.D. Cal. June 7, 2022) (finding that delays caused by the petitioner to "develop affirmative relief in the face of his removability . . . . does not deprive him of a constitutional right to due process," especially because "the proceedings have been significantly prolonged for reasons beyond his control."). Hence, the fourth factor minimally favors Respondents.

The fifth factor considers the delays in removal caused by the government. *Banda*, 385 F. Supp. 3d at 1120. "[I]f immigration officials have caused delay, it weighs in favor of finding continued detention unreasonable . . . Continued detention will also appear more unreasonable when the delay in proceedings was caused by the immigration court or other non-ICE government officials." *Galkin*, 2026 U.S. Dist. LEXIS 46838, at *11 (quoting *Sajous v. Decker*, No. 18-cv-2447 (AJN), 2018 U.S. Dist. LEXIS 86921, at *35 (S.D.N.Y. May 23, 2018)). While Petitioner's appeal has caused a delay in his removal, the Court notes that "any 'delay in this case is a product of the BIA's and Ninth Circuit's 'crowded dockets,' which courts typically attribute to the Government—not the Petitioner." *Galkin*,

2026 U.S. Dist. LEXIS 46838, at *11 (quoting *Djelassi v. Ice Field Off. Dir.*, 434 F. Supp. 3d 917, 923 (W.D. Wash. 2020)). Hence, the fifth factor slightly favors Petitioner.

*v. Likelihood of Removal.*

The final *Banda* factor requires the Court to consider "the likelihood that the final proceedings will culminate in a final order of removal." *Banda*, 385 F. Supp. 3d at 1120 (citation omitted). "[W]here a noncitizen has asserted a good faith challenge to removal, 'the categorical nature of the detention will become increasingly unreasonable.'" *Id.* (quoting *Sajous*, 2018 U.S. Dist. LEXIS 86921, at *37). Based on the current record, "the Court lacks sufficient information to comment on the potential merits of [P]etitioner's pending appeal." *Galkin*, 2026 U.S. Dist. LEXIS 46838, at *12. Therefore, the sixth factor is neutral.

*vi. Conclusion.*

Considering three of the *Banda* factors favor Petitioner, one factor slightly favors Respondents, and two factors are neutral, the Court concludes that Petitioner's continued detention under § 1225(b)(2) has become unreasonable. Therefore, under the *Banda* factors, Petitioner is entitled to relief.

In any event, even were the Court not to apply *Banda*, Petitioner would be entitled to a bond hearing. As the Presiding Judge has recognized, a petitioner whose removal "cease[s] to be[] reasonably foreseeable" may be able to seek release, because the INA "permit[s] detention only while removal remains reasonably foreseeable[.]" *Ibarra-Perez*, 468 F. Supp. 3d at 1177–78 (quoting *Nadarajah v. Gonzales*, 443 F.3d 1069, 1078 (9th Cir. 2006)). This finding remains apposite today, based on sister circuit decisions finding that "detention without an individualized bond hearing can become constitutionally impermissible, even if the detention has a theoretical end point.'" *Rodriguez*, 2026 U.S. App. LEXIS 19508, at *48 (quoting *Lopez-Campos v. Raycraft*, 175 F.4th 713, 734 (6th Cir. 2026). In the case at hand, considering Petitioner's sixteen-month detention and the potential years it may take for his immigration case to be closed and final, his detention has become constitutionally impermissible. Even considering that the INA does not

statutorily provide bond hearings for 1225(b) petitioners, a statute does not reign supreme under our federal system—the Constitution does. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) (noting that the Constitution is "the fundamental and paramount law of the nation"). Hence, the INA's failure to statutorily provide bond hearings for petitioners held under section 1225(b) does not override Petitioner's Fifth Amendment right to due process.

**C. Remedy**.

Where a noncitizen's detention under § 1225(b)(2) has become unreasonable, the proper remedy is an individualized bond hearing before a neutral IJ. *See Galkin*, 2026 U.S. Dist. LEXIS 46838, at *12 (finding that "there is no authority" supporting relief in the form of immediate release, but there is authority supporting relief in the form of a bond hearing) (cleaned up); *see also Lopez*, 631 F. Supp. 3d at 882 ("The Court finds, consistent with other post-*Jennings* cases, that the appropriate remedy is a bond hearing before an immigration judge rather than immediate release."); *Kaur v. Lyons*, 2:26-cv-00217-KML, at *1 (D. Ariz. Apr. 9, 2026) (adopting the magistrate judge's recommendations for a 1225(b)(2) petitioner and granting a bond hearing).

At the bond hearing, Respondents bear the burden of proving that Petitioner is a danger or flight risk by clear and convincing evidence. *Singh v. Holder*, 638 F.3d 1196, 1203–05 (9th Cir. 2011). Additionally, "[i]n the event Petitioner is 'determined not to be a danger to the community and not to be so great a flight risk as to require detention without bond,' the [IJ] should consider Petitioner's financial circumstances and alternative conditions of release." *See Liang Ding*, 2026 U.S. Dist. LEXIS 58212, at *7 (quoting *Hernandez v. Sessions*, 872 F.3d 976, 1000 (9th Cir. 2017)).

//

///

//

///

//

Accordingly,

**IT IS RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus (doc. 1) be **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER RECOMMENDED** that Petitioner's request for immediate release be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Petitioner be provided an individualized bond hearing within **SEVEN (7) DAYS** of the adoption of this Report and Recommendation. This bond hearing shall comply with the procedural requirements set out in *Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011). The government shall bear the burden of proving that Petitioner is a danger or flight risk by clear and convincing evidence. Additionally, the IJ should consider Petitioner's financial situation and alternative conditions of release. *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017). In the alternative, the government may release Petitioner under appropriate conditions of release.

**IT IS FURTHER RECOMMENDED** that Petitioner **SHALL** be provided with adequate notice prior to the hearing.

**IT IS FURTHER RECOMMENDED** that the government shall file a status report with the Court regarding the bond hearing and whether Petitioner was released within **FOURTEEN (14) DAYS** of the date this Report and Recommendation is adopted.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment. The parties shall have 14 days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See* 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 6, 72. Thereafter, the parties have 14 days within which to file a response to the objections.

Failure to file timely objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc). Failure to file timely objections to any factual

determinations of the Magistrate Judge may be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See* Fed. R. Civ. P. 72.

Dated this 13th day of August, 2026.

Honorable John Z. Boyle
United States Magistrate Judge